UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BEATRIZ E. EBEL, Individually and as | § | |
| Personal Representative of the | § | |
| Estate of PHILIP WAYNE EBEL, | § | |
| Deceased, and as Next Friend of | § | |
| ERIC FERNANDO EBEL and | § | |
| GABRIELA NICOLE EBEL, Minors, | § | |
|     Plaintiff, | § | CIVIL ACTION NO. 1:04-CV-194 |
| | § | |
| vs. | § | |
| | § | |
| ELI LILLY AND COMPANY, | § | |
|     Defendant. | § | |

**DEFENDANT ELI LILLY AND COMPANY'S**
**PRELIMINARY DRAFT JURY CHARGE**

Defendant Eli Lilly and Company ("Lilly") files this Preliminary Draft Jury

Charge as follows.

Respectfully submitted,


By: S/ Kristi Belt
    GENE M. WILLIAMS
    State Bar No. 21535300
    S.D. ID. No. 1328
    KRISTI BELT
    State Bar No.  24026798
    S.D. ID No. 27449
    KATHLEEN A. FRAZIER
    State Bar No. 24043663
    S.D. ID. No. 38952
    SHOOK, HARDY & BACON, L.L.P.
    JPMorgan Chase Tower
    600 Travis Street, Suite 1600
    Houston, TX   77002-2911
    Telephone:     (713) 227-8008
    Telefax:       (713) 227-9508

NINA M. GUSSACK
ANDREW R. ROGOFF
CHARLES J. KOCHER
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA   19103
Telephone:     (215) 981-4000

EDUARDO R. RODRIGUEZ
State Bar No. 00000080
S.D. ID. No. 1944
MITCHELL C. CHANEY
State Bar No. 04107500
S.D. ID No. 1918
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
Post Office Box 1255
1201 E. Van Buren
Brownsville, TX   78522
Telephone:     (713) 542-7441
Telefax:        (713) 541-2170

**ATTORNEYS FOR DEFENDANT,
ELI LILLY AND COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2008, I electronically transmitted the foregoing **DEFENDANT ELI LILLY AND COMPANY'S PRELIMINARY DRAFT JURY CHARGE** to opposing counsel of record addressed as follows:

Andy Vickery
VICKERY, WALDNER & MALLIA, LLP
One Riverway Drive, Suite 1150
Houston, TX 77056
***(via E-mail)***

ATTORNEYS FOR PLAINTIFF

S/ Charles J. Kocher
Charles J. Kocher

260712v2

## PRELIMINARY STATEMENT

By submitting this draft charge, Lilly is not admitting that there is any evidence to support the submission of the attached questions, instructions, and/or definitions to the jury.

Lilly also objects to the submission of more than one liability question. *See Hyundai Motor Co. v. Rodriguez by Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999) ("[T]wo or more factually identical defective design claims … should not be submitted to the trier of fact in the same case under different doctrinal labels.") (quoting draft of RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. n); *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 255 (Tex. 1974) ("We disapprove the practice of submitting the same issue in two different ways"); *cf. Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 256-57 (5th Cir 1988) (holding that a manufacturer cannot be liable for negligence when the product was not defective) (applying Texas law); *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315-19 (Tex. App.—Dallas 2004, pet. denied) (holding that a jury finding of negligence was irreconcilable with a jury finding of no defect).

Nevertheless, Lilly hereby submits the proper questions, instructions, and definitions for all liability theories that Plaintiff appears to be pursuing.

260712v2

## CHARGE OF THE COURT

**MEMBERS OF THE JURY:**

You have heard the evidence in this case.  I will now instruct you on the law that you must apply.  It is your duty to follow the law as I give it you.  On the other hand, you jury are the judges of the facts.  Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

[After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.]  [You have heard the closing arguments of the attorneys.]  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' contentions.

Answer each question from the facts as you find them.  Do not decide who you think should win and then answer the questions accordingly.  Your answers and your verdict must be unanimous.

You must answer all questions from a preponderance of the evidence.  By this is meant the greater weight and degree of credible evidence before you.  In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so.  In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

[You will recall that during the course of this trial I instructed you that certain testimony and certain exhibits were admitted into evidence for a limited purpose and I instructed you that you may consider some documents as evidence against one party but not against

4

another.  You may consider such evidence only for the specific limited purposes for which it was admitted.  (specific limiting instructions may be repeated as appropriate.)]

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply any innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case.  One is direct evidence—such as testimony of an eyewitness.

260712v2

The other is indirect or circumstantial evidence—the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.  As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—he is called an expert witness—is permitted to state his opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of a expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and his income from such testimony represents a significant portion of his income.

[Any notes that you have taken during this trial are only aids to memory.  If your memory should differ from your notes, then you should rely on your memory and not on the notes.  The notes are not evidence.  A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.]

When you retire to the jury room to deliberate on your verdict, you may take [this charge with you as well as] exhibits which the Court has admitted into evidence.  Select your Foreperson and conduct your deliberations.  If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during the trial.  After you

6

have reached your unanimous verdict, your Foreperson is to fill in on the form your answers to the questions.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me.  I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.  I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.  [You may now retire to the jury room to conduct your deliberations.][1]

_____
JUDGE PRESIDING

---

[1]      Fifth Circuit Pattern Jury Instructions, Civil § 3.1 (West 2006).

## QUESTION NO. 1  - ALLEGED NEGLIGENCE

Did the negligence, if any, of those named below proximately cause the injury in question?[2]

"Negligence," when used with respect to the conduct of Philip Ebel, means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.[3]

"Ordinary care," when used with respect to the conduct of Philip Ebel, means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.[4]

"Proximate cause," when used with respect to the conduct of Philip Ebel, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.[5]

"Negligence," when used with respect to the conduct of Eli Lilly and Company ("Lilly"), means failure to use ordinary care, that is, failing to do that which a pharmaceutical manufacturer of ordinary prudence would have done under the same or similar circumstances or doing that which a pharmaceutical manufacturer of ordinary prudence would not have done under the same or similar circumstances.[6]

"Ordinary care," when used with respect to the conduct of Lilly, means that degree of care that a pharmaceutical manufacturer of ordinary prudence would use under the same or similar circumstances.[7]

"Proximate cause," when used with respect to the conduct of Lilly, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission

---

[2]     Texas Pattern Jury Charge ("PJC") 4.1 (2006).

[3]     PJC 2.1.

[4]     *See* PJC 2.1; *see also* PJC 60.1 (providing examples of the use of the phrase "when used with respect to the conduct of" in the definition of "ordinary care").

[5]     *See* PJC 2.4; *see also* PJC 60.1 (providing examples of the use of the phrase "when used with respect to the conduct of" in the definition of "proximate cause").

[6]     PJC 60.1; *cf. FFE Transp. Services, Inc. v. Fulgham*, 154 S.W.3d 84, 90-93 (Tex. 2004) (holding that a plaintiff must present expert testimony to prove the manufacturer's standard of care in a case about an allegedly dangerous, complex product).

[7]     PJC 60.1; *cf. FFE*, 154 S.W.3d at 90-93 (holding that a plaintiff must present expert testimony to prove the manufacturer's standard of care in a case about an allegedly dangerous, complex product).

260712v2

complained of must be such that a pharmaceutical manufacturer using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.[8]

There may be more than one proximate cause of an event, but if Philip Ebel's suicide or if an act or omission of any person not a party to the suit was the "sole proximate cause" of an occurrence, then no act or omission of any other person could have been the proximate cause.[9]

Lilly is presumed to not be liable with respect to allegations involving failure to provide adequate warnings or information if the warnings or information that accompanied the product in its distribution were those approved by the United States Food and Drug Administration ("FDA").  Beatriz Ebel may rebut the presumption by establishing that:  (1) Lilly recommended, promoted, or advertised Zyprexa for an indication not approved by the FDA; (2) Zyprexa was used as recommended, promoted, or advertised; and (3) Philip Ebel's injury was causally related to the recommended, promoted, or advertised use of the product.[10]

An "indication" refers to the "indications and usage" section of the warning label for a prescription medication, which lists the FDA-approved uses of the medication.[11]  A pharmaceutical company may not promote its medications in a manner that is inconsistent with the FDA-approved label.[12]  However, off-label use of medications is not illegal.[13]  "A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."[14]  Similarly, dissemination of accurate off-label information by a pharmaceutical company in a non-promotional manner is not illegal and is protected by the First Amendment to the U.S. Constitution.[15]

---

[8]      PJC 60.1; *cf. FFE*, 154 S.W.3d at 90-93 (holding that a plaintiff must present expert testimony to prove the manufacturer's standard of care in a case about an allegedly dangerous, complex product).

[9]      PJC 3.2 (modified pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (Vernon 2005)).

[10]     TEX. CIV. PRAC. & REM. CODE ANN. § 82.007 (Vernon 2005)); *cf.* PJC 51.12 (providing examples of jury instructions for rebuttable presumptions).  There is no basis by which Beatriz Ebel may overcome the rebuttable presumption under Section 82.007.  In particular, there is no evidence that Lilly "recommended, promoted, or advertised" Zyprexa for an off-label use.  Therefore, there is no evidentiary basis to provide any instruction for how Beatriz Ebel may rebut the presumption.

[11] 21 C.F.R. § 201.57(c).

[12] 21 C.F.R. § 202.1(1)(2); *United States v. Kordel*, 335 U.S. 345, 350 (1948).

[13] *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)

[14] *Washington Legal Foundation v. Henney*, 202 F.3d 331, 333(D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."); *accord* Center for Drug Evaluation and Research (CDER), U.S. Food and Drug Administration.  Oncology Tools: A Short Tour. http://www.fda.gov/cder/cancer/tour.htm (last updated 05/02/2007) (accessed January 10, 2008) ("Any approved product may be used by a licensed practitioner for uses other than those stated in the product label.").

[15] *Washington Legal Foundation v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999) (*WLF III*); *Washington Legal Foundation v. Friedman*, 36 F. Supp. 2d 16 (D.D.C. 1999) (*WLF II*); *Washington Legal Foundation v. Friedman*, 13 F .Supp. 2d 51 (D.D.C. 1998) ( *WLF I*); *vacated as moot sub nom. Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) (*WLF IV*).

9

A prescription medication manufacturer can only be negligent in marketing a prescription medication if there exists a "marketing defect" in the product.[16]

A "marketing defect" with respect to a prescription medication means the failure to give adequate warnings to the medical profession of the prescription medication's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to the medical profession to avoid such dangers, which failure rendered the prescription medication "unreasonably dangerous" as marketed.[17]

"Adequate" warnings or instructions means warnings or instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent physician in the circumstances of the prescription medication's use; and the content of the warnings or instructions must be comprehensible to the average physician and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent physician.[18]

An "unreasonably dangerous" prescription medication is one that is dangerous to an extent beyond that which would be contemplated by the ordinary physician with the ordinary knowledge common to the medical profession as to the prescription medication's characteristics.[19]

Answer "Yes" or "No" for each of the following:

a.    Philip Ebel:                    _____

b.    Lilly:                              _____

---

[16]    *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 256-57 (5th Cir 1988) (holding that a manufacturer cannot be liable for negligence when the product was not defective) (applying Texas law).

[17]    PJC 71.5 (modified to reflect the learned intermediary doctrine).

[18]    PJC 71.5 (modified to reflect the learned intermediary doctrine); *Bean v. Baxter Healthcare Corp.*, 965 S.W.2d 656, 660-64 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

[19]    PJC 71.5 (modified to reflect the learned intermediary doctrine); *Sauder Custom Fab. Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex. 1998).

## QUESTION NO. 2  - ALLEGED MARKETING DEFECT

Was there a defect in the marketing of Zyprexa at the time it left the possession of Lilly that was a producing cause of the injury in question?[20]

A "marketing defect" with respect to a prescription medication means the failure to give adequate warnings to the medical profession of the prescription medication's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to the medical profession to avoid such dangers, which failure rendered the prescription medication "unreasonably dangerous" as marketed.[21]

"Adequate" warnings or instructions means warnings or instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent physician in the circumstances of the prescription medication's use; and the content of the warnings or instructions must be comprehensible to the average physician and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent physician.[22]

An "unreasonably dangerous" prescription medication is one that is dangerous to an extent beyond that which would be contemplated by the ordinary physician with the ordinary knowledge common to the medical profession as to the prescription medication's characteristics.[23]

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produces the injury and without which the injury would not have otherwise occurred.[24]

There may be more than one producing cause of an injury.  But if Philip Ebel's suicide or if an act or omission of anyone who is not a party to the suit was the "sole cause" of the injury, then the act, omission, or product of any party could have been a cause of the injury.[25]

---

[20]     PJC 71.5.

[21]     PJC 71.5 (modified to reflect the learned intermediary doctrine).

[22]     PJC 71.5 (modified to reflect the learned intermediary doctrine); *Bean v. Baxter Healthcare Corp.*, 965 S.W.2d 656, 660-64 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

[23]     PJC 71.5 (modified to reflect the learned intermediary doctrine); *Sauder Custom Fab. Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex. 1998).

[24]     PJC 70.1 (modified as explained).  Producing cause means "an act that is a substantial factor that brings about injury *and without which the injury would not have occurred.*"  *Trinity Universal Ins. Co. v. Bleeker*, 966 S.W.2d 489, 491 (Tex. 1998) (emphasis added & citations omitted).  The PJC does not include at the end of the first sentence the phrase "and without which the injury would not have otherwise occurred."  This omission is significant because it implies to the jury that it may ignore Plaintiff's burden to prove that the alleged injuries would not have occurred "but for" the alleged conduct.  Therefore, the Court should use the Supreme Court's formulation instead of the PJC's formulation.

[25]     PJC 70.4 (modified pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (Vernon 2005)).

11

Lilly is presumed to not be liable with respect to allegations involving failure to provide adequate warnings or information if the warnings or information that accompanied the product in its distribution were those approved by the FDA.   Beatriz Ebel may rebut the presumption by establishing that:  (1) Lilly recommended, promoted, or advertised Zyprexa for an indication not approved by the FDA; (2) Zyprexa was used as recommended, promoted, or advertised; and (3) Philip Ebel's injury was causally related to the recommended, promoted, or advertised use of the product.[26]

An "indication" refers to the "indications and usage" section of the warning label for a prescription medication, which lists the FDA-approved uses of the medication.[27]  A pharmaceutical company may not promote its medications in a manner that is inconsistent with the FDA-approved label.[28]  However, off-label use of medications is not illegal.[29]  "A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."[30]  Similarly, dissemination of accurate off-label information by a pharmaceutical company in a non-promotional manner is not illegal and is protected by the First Amendment to the U.S. Constitution.[31]

Answer "Yes" or "No"

Answer:_____

---

[26] TEX. CIV. PRAC. & REM. CODE ANN. § 82.007 (Vernon 2005)); *cf.* PJC 51.12 (providing examples of jury instructions for rebuttable presumptions).  There is no basis by which Beatriz Ebel may overcome the rebuttable presumption under Section 82.007.  In particular, there is no evidence that Lilly "recommended, promoted, or advertised" Zyprexa for an off-label use.  Therefore, there is no evidentiary basis to provide any instruction for how Beatriz Ebel may rebut the presumption.

[27] 21 C.F.R. § 201.57(c).

[28] 21 C.F.R. § 202.1(1)(2); *United States v. Kordel*, 335 U.S. 345, 350 (1948).

[29] *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)

[30] *Washington Legal Foundation v. Henney*, 202 F.3d 331, 333(D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."); *accord* Center for Drug Evaluation and Research (CDER), U.S. Food and Drug Administration.  Oncology Tools: A Short Tour.  http://www.fda.gov/cder/cancer/tour.htm (last updated 05/02/2007) (accessed January 10, 2008) ("Any approved product may be used by a licensed practitioner for uses other than those stated in the product label.").

[31] *Washington Legal Foundation v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999) (*WLF III*); *Washington Legal Foundation v. Friedman*, 36 F. Supp. 2d 16 (D.D.C. 1999) (*WLF II*); *Washington Legal Foundation v. Friedman*, 13 F .Supp. 2d 51 (D.D.C. 1998) ( *WLF I*); *vacated as moot sub nom. Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) (*WLF IV*).

**QUESTION NO. 3  - ALLEGED MISREPRESENTATION**

Was there a misrepresentation by Lilly that was a producing cause of the injury in question?[32]

There was a misrepresentation if—

1.    Lilly represented to the medical profession that the prescription medication Zyprexa _____ [did not cause suicide or akathisia][33] and

2.    the Zyprexa in question failed to _____;

3.    the representation about _____ [the safety of Zyprexa] involved a material fact concerning the character or quality of the Zyprexa in question; and

4.    Dr. Nett relied on such representation in prescribing Zyprexa for use by Philip Ebel.[34]

A "material fact" is a fact that is important to a normal prescribing physician by which the prescribing physician may justifiably be expected to be influenced in making the decision to prescribe the medication.[35]

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produces the injury and without which the injury would not have otherwise occurred.[36]

There may be more than one producing cause of an injury.  But if Philip Ebel's suicide or if an act or omission of anyone who is not a party to the suit was the "sole cause" of the injury, then the act, omission, or product of any party could have been a cause of the injury.[37]

---

[32]    PJC 71.6.

[33]    Ebel's Complaint does not specify the alleged misrepresentation.  Under the Fifth Circuit's reading of Texas law, Ebel can only assert express misrepresentations under this cause of action.  *See Rehler v. Beech Aircraft Corp.*, 777 F.2d 1072, 1077 (5th Cir. 1985) ("Our understanding is that the Texas law of section 402B covers only affirmative or express misrepresentations.") (surveying Texas law).  Of course, Lilly strongly maintains that there is no misrepresentation of any sort.

[34]    PJC 71.6 (modified pursuant to comment).

[35]    PJC 71.6 (modified to account for the learned intermediary doctrine).

[36]    PJC 70.1 (modified as explained).  Producing cause means "an act that is a substantial factor that brings about injury *and without which the injury would not have occurred*." *Trinity Universal*, 966 S.W.2d at 491 (emphasis added & citations omitted).  The PJC does not include at the end of the first sentence the phrase "and without which the injury would not have otherwise occurred."  This omission is significant because it implies to the jury that it may ignore Plaintiff's burden to prove that the alleged injuries would not have occurred "but for" the alleged conduct.  Therefore, the Court should use the Supreme Court's formulation instead of the PJC's formulation.

[37]    PJC 70.4 (modified pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (Vernon 2005)).

Lilly is presumed to not be liable with respect to allegations involving failure to provide adequate warnings or information if the warnings or information that accompanied the product in its distribution were those approved by the FDA.  Beatriz Ebel may rebut the presumption by establishing that:  (1) Lilly recommended, promoted, or advertised Zyprexa for an indication not approved by the FDA; (2) Zyprexa was used as recommended, promoted, or advertised; and (3) Philip Ebel's injury was causally related to the recommended, promoted, or advertised use of the product.[38]

An "indication" refers to the "indications and usage" section of the warning label for a prescription medication, which lists the FDA-approved uses of the medication.[39]  A pharmaceutical company may not promote its medications in a manner that is inconsistent with the FDA-approved label.[40]  However, off-label use of medications is not illegal.[41]  "A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."[42]  Similarly, dissemination of accurate off-label information by a pharmaceutical company in a non-promotional manner is not illegal and is protected by the First Amendment to the U.S. Constitution.[43]

Answer "Yes" or "No"

Answer:_____

---

[38]    TEX. CIV. PRAC. & REM. CODE ANN. § 82.007 (Vernon 2005)); *cf.* PJC 51.12 (providing examples of jury instructions for rebuttable presumptions).  There is no basis by which Beatriz Ebel may overcome the rebuttable presumption under Section 82.007.  In particular, there is no evidence that Lilly "recommended, promoted, or advertised" Zyprexa for an off-label use.  Therefore, there is no evidentiary basis to provide any instruction for how Beatriz Ebel may rebut the presumption.

[39] 21 C.F.R. § 201.57(c).

[40] 21 C.F.R. § 202.1(1)(2); *United States v. Kordel*, 335 U.S. 345, 350 (1948).

[41] *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)

[42] *Washington Legal Foundation v. Henney*, 202 F.3d 331, 333(D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."); *accord* Center for Drug Evaluation and Research (CDER), U.S. Food and Drug Administration.  Oncology Tools: A Short Tour.  http://www.fda.gov/cder/cancer/tour.htm (last updated 05/02/2007) (accessed January 10, 2008) ("Any approved product may be used by a licensed practitioner for uses other than those stated in the product label.").

[43] *Washington Legal Foundation v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999) (*WLF III*); *Washington Legal Foundation v. Friedman*, 36 F. Supp. 2d 16 (D.D.C. 1999) (*WLF II*); *Washington Legal Foundation v. Friedman*, 13 F .Supp. 2d 51 (D.D.C. 1998) ( *WLF I*); *vacated as moot sub nom. Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) (*WLF IV*).

## QUESTION NO. 4  - ALLEGED BREACH OF WARRANTY

Was the Zyprexa supplied by Lilly unfit for the ordinary purposes for which such prescription medications are used because of a defect, and, if so, was such unfit condition a proximate cause of the injury in question?[44]

A "defect" means a condition of the goods that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.[45]

"Proximate cause," when used with respect to the conduct of Lilly, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a pharmaceutical manufacturer using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.[46]

There may be more than one proximate cause of an event.  But if Philip Ebel's suicide or if an act or omission of anyone who is not a party to the suit was the "sole proximate cause" of an occurrence, then the act or omission of any party could not have been the proximate cause.[47]

Lilly is presumed to not be liable with respect to allegations involving failure to provide adequate warnings or information if the warnings or information that accompanied the product in its distribution were those approved by the FDA.   Beatriz Ebel may rebut the presumption by establishing that:  (1) Lilly recommended, promoted, or advertised Zyprexa for an indication not approved by the FDA; (2) Zyprexa was used as recommended, promoted, or advertised; and (3) Philip Ebel's injury was causally related to the recommended, promoted, or advertised use of the product.[48]

---

[44]     PJC 71.8.  Ebel's Complaint does not specify what specific breach of warranty she is alleging.  Lilly includes PJC 71.8 (TEX. BUS. & COM. CODE § 2.314(b)(3)) for the convenience of the parties.  Lilly, however, objects to the submission of this or any other breach of warranty claim because there is no evidence of basic elements of the warranty causes of action.  For example, there is no evidence that Zyprexa was unfit for the ordinary purposes for which it is normally used.  *See, e.g., Ackermann v. Wyeth Pharmaceuticals*, 471 F. Supp. 2d 739, 745 (E.D. Tex. 2006) ("The fact that drugs such as Effexor may cause different reactions in a small group of patients is not tantamount to a holding that the drug is somehow inadequate.").  Indeed, FDA has found that Zyprexa is safe and effective for its ordinary purposes, thus pre-empting this allegation.  Likewise, there is no evidence of a "lack" of something necessary for Zyprexa to be adequate.

[45]     PJC 71.8.

[46]     PJC 60.1; *cf. FFE*, 154 S.W.3d at 90-93 (holding that a plaintiff must present expert testimony to prove the manufacturer's standard of care in a case about an allegedly dangerous, complex product).

[47]     PJC 60.3 (modified pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (Vernon 2005)).

[48]     TEX. CIV. PRAC. & REM. CODE ANN. § 82.007 (Vernon 2005)); *cf.* PJC 51.12 (providing examples of jury instructions for rebuttable presumptions).  There is no basis by which Beatriz Ebel may overcome the rebuttable presumption under Section 82.007.  In particular, there is no evidence that Lilly "recommended, promoted, or advertised" Zyprexa for an off-label use.  Therefore, there is no evidentiary basis to provide any instruction for how Beatriz Ebel may rebut the presumption.

15

An "indication" refers to the "indications and usage" section of the warning label for a prescription medication, which lists the FDA-approved uses of the medication.[49] A pharmaceutical company may not promote its medications in a manner that is inconsistent with the FDA-approved label.[50] However, off-label use of medications is not illegal.[51] "A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."[52] Similarly, dissemination of accurate off-label information by a pharmaceutical company in a non-promotional manner is not illegal and is protected by the First Amendment to the U.S. Constitution.[53]

Answer "Yes" or "No"

Answer:_____

---

[49] 21 C.F.R. § 201.57(c).

[50] 21 C.F.R. § 202.1(1)(2); *United States v. Kordel*, 335 U.S. 345, 350 (1948).

[51] *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)

[52] *Washington Legal Foundation v. Henney*, 202 F.3d 331, 333(D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."); *accord* Center for Drug Evaluation and Research (CDER), U.S. Food and Drug Administration.  Oncology Tools: A Short Tour. http://www.fda.gov/cder/cancer/tour.htm (last updated 05/02/2007) (accessed January 10, 2008) ("Any approved product may be used by a licensed practitioner for uses other than those stated in the product label.").

[53] *Washington Legal Foundation v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999) (*WLF III*); *Washington Legal Foundation v. Friedman*, 36 F. Supp. 2d 16 (D.D.C. 1999) (*WLF II*); *Washington Legal Foundation v. Friedman*, 13 F .Supp. 2d 51 (D.D.C. 1998) ( *WLF I*); *vacated as moot sub nom. Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) (*WLF IV*).

If you have answered "Yes" to Question 4 for Lilly, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 5  - COMPLIANCE WITH NOTICE REQUIREMENT

Did Beatriz Ebel give Lilly reasonable notice of the alleged defect you found in response to Question 4 within a reasonable time?[54]

For notice to be reasonable, the manufacturer must be made aware of a problem with a particular product purchased by a particular buyer.  The commencement of litigation does not satisfy the notice requirement.[55]

To determine whether notice was provided within a reasonable time, you should consider the time after the buyer discovers or should have discovered the alleged defect.[56]

Answer "Yes" or "No"

Answer:_____

---

[54]       *See generally* TEX. BUS. & COM. CODE ANN. § 2.607(c)(1); *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 200 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("The burden of alleging and proving notice under 2.607(c)(1) is properly placed on the buyer.…  As other jurisdictions have noted, this notice requirement is better described as a condition precedent for a buyer's cause of action.") (citations omitted); *Ackermann v. Wyeth Pharmaceuticals*, 471 F. Supp. 2d 739 (E.D. Tex. 2006) (requiring notice under Section 2.607 in a suicide case); *see also* PJC 102.22.

[55]       *See U.S. Tire-Tech*, 110 S.W.3d at 201-02 ("The manufacturer must be made aware of a problem with a particular product purchased by a particular buyer.…  Neither did the commencement of litigation satisfy this notice requirement.") (citations omitted).

[56]       *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 674 (Tex. 2004) (citing court of appeals decision for proposition that, in Texas, Section 2.607(c)(1) "requires that a buyer notify any seller, including a remote seller such as the manufacturer, of the product's alleged defect within a reasonable time of discovering the defect and that failure to do so bars the buyer from any remedy for breach of warranty .…") (citations omitted); *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 190 (Tex. App.—Dallas 1996, no writ) ("section 2.607(c)(1) requires the buyer to notify the seller that a breach of warranty has occurred within a reasonable time after he discovers or should have discovered any breach.") (citations omitted).

If you have answered "Yes" to Questions 1, 2, 3, or 4 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.[57]

The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of causation attributable to a person or product is not necessarily measured by the number of acts, omissions, or products defects found.[58]

## QUESTION NO. 6 - PROPORTIONATE LIABILITY

For each person found by you to have caused the injury, find the percentage caused by—

a.     Philip Ebel:              _____%

b.     Lilly:                    _____%

Total 100%[59]

---

[57]     PJC 71.12.

[58]     PJC 71.12 (modified to remove last sentence, which does not apply).

[59]     PJC 71.12 (modified to use "Lilly" instead of the product).

If the plaintiff has proven her claim against the defendant by a preponderance of the evidence, you must determine the damages to which the plaintiff is entitled. You should not interpret the fact that I have given instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should, or should not, win this case. It is your task first to decide whether the defendant is liable. I am instructing you on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiff is entitled to recover money from the defendant.[60]

Answer Question 7 if you answered "Yes" for Lilly to Questions 1, 2, 3, or 4 and answered:

> (1) "No" for Philip Ebel to Question 1, or
>
> (2) 50 percent or less for Philip Ebel to Question 6.

Otherwise, do not answer Question No. 7.[61]

## QUESTION NO. 7 - ALLEGED WRONGFUL DEATH DAMAGES

What sum of money, if paid now in cash, would fairly and reasonably compensate Beatriz Ebel, Eric Ebel, and Gabriela Ebel for their damages, if any, resulting from the death of Philip Ebel?[62]

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.[63]

You are instructed that any monetary recovery for "pecuniary loss," "loss of addition to the estate," "loss of companionship and society," or "mental anguish" is subject to federal income taxes. Any recovery for _____ is not subject to federal income taxes.[64]

Answer separately, in dollars and cents, for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Philip Ebel.[65]

a.    Primary pecuniary loss sustained in the past by

   Beatriz Ebel                              Answer: _____

   Eric Ebel                                 Answer: _____

---

[60]    Fifth Circuit Pattern Jury Instructions, Civil § 15.1 (modified only to reflect plaintiff's gender).

[61]    PJC 81.1.

[62]    PJC 81.3 & 81.4.

[63]    PJC 81.3 & 81.4.

[64]    PJC 81.2; *see also* 28 U.S.C. § 104 (describing exclusion from federal income taxes).

[65]    PJC 81.3 & 81.4.

Gabriela Ebel     Answer: _____

"Primary pecuniary loss" means the loss of the maintenance, support, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that, in reasonable probability, would have been received from Philip Ebel had he lived.[66]

  b. Primary pecuniary loss that, in reasonable probability, will be sustained in the future by

Beatriz Ebel     Answer: _____

Eric Ebel      Answer: _____

Gabriela Ebel     Answer: _____

  c. Secondary pecuniary loss sustained in the past by

Beatriz Ebel     Answer: _____

Eric Ebel      Answer: _____

Gabriela Ebel     Answer: _____

"Secondary pecuniary loss" means the loss of the care, services, advice, and counsel of a pecuniary value that, in reasonable probability, would have been received from Philip Ebel had he lived.[67]

  d. Secondary pecuniary loss that, in reasonable probability, will be sustained in the future by

Beatriz Ebel     Answer: _____

Eric Ebel      Answer: _____

Gabriela Ebel     Answer: _____

  e. Loss of companionship and society sustained in the past by

---

[66] PJC 81.3 & 81.4 (modified pursuant to *Harris Co. v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002)). Lilly objects to the submission of these elements of "pecuniary loss" because there is no evidence to support them. Under *Harris Co.*, the Court should use "granulated" jury questions to submit damages issues when a party objects that there is no evidence to support those elements. In this case, there is no evidence that Philip Ebel could have provided financial support to Plaintiffs. Ebel was unemployed at the time of his death. Plaintiffs presented no evidence of Ebel's future employment. Instead, Plaintiffs elected to present evidence of speculative business ventures that Ebel was allegedly contemplating. This constitutes no evidence of Ebel's ability to provide any financial support to Plaintiffs. *See, e.g.*, *Donsbach v. Offield*, 488 S.W.2d 494, 496 (Tex. Civ. App.—Austin 1972, no writ) (rejecting damages to adult children based on death of unemployed parent, explaining that "[d]amages must be proved with certainly and cannot be left to conjecture, guess or speculation.") (citations omitted).

[67] PJC 81.3 & 81.4 (modified pursuant to *Harris Co.*, 96 S.W.3d at 234). This list of "secondary" pecuniary losses consists of elements that are not related to Philip Ebel's ability to provide financial support to Plaintiffs.

Beatriz Ebel                    Answer: _____

Eric Ebel                       Answer: _____

Gabriela Ebel                   Answer: _____

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that, in reasonable probability, would have been received from Philip Ebel had he lived.[68]

f.      Loss of companionship and society that, in reasonable probability, will be sustained in the future by

Beatriz Ebel                    Answer: _____

Eric Ebel                       Answer: _____

Gabriela Ebel                   Answer: _____

g.      Mental anguish sustained in the past by

Beatriz Ebel                    Answer: _____

Eric Ebel                       Answer: _____

Gabriela Ebel                   Answer: _____

"Mental anguish" means the emotional pain, torment, and suffering experienced because of the death of Philip Ebel.[69]

h.      Mental anguish that, in reasonable probability, will be sustained in the future by

Beatriz Ebel                    Answer: _____

Eric Ebel                       Answer: _____

Gabriela Ebel                   Answer: _____

In determining damages for elements e, f, g, and h, you may consider the relationship between Beatriz Ebel, Eric Ebel, and Gabriela Ebel and Philip Ebel, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

i.      Loss of addition to the estate.

---

[68]    PJC 81.3 & 81.4.

[69]    PJC 81.3 & 81.4.

260712v2

Answer: _____

"Loss of addition to the estate" means the loss of the present value of assets that Philip Ebel, in reasonable probability, would have added to the estate existing at the end of his natural life.[70]

---

[70]     PJC 81.3 & 81.4 (comment entitled "Loss of inheritance."). Lilly objects to the submission of inheritance damages (or loss of "addition to the estate" damages) because there is no evidence to support such damages. Specifically, there is no evidence that Philip Ebel could have increased his estate. Ebel was unemployed at the time of his death. Plaintiffs presented no evidence of Ebel's future employment. Instead, Plaintiffs elected to present evidence of speculative business ventures that Ebel was allegedly contemplating. This constitutes no evidence of Ebel's ability to increase his estate. *See*, *e.g.*, *Donsbach*, 488 S.W.2d at 496 (rejecting damages to adult children based on death of unemployed parent, explaining that "[d]amages must be proved with certainly and cannot be left to conjecture, guess or speculation.") (citations omitted).

22

Answer Question 8 if you answered "Yes" for Lilly to Questions 1, 2, 3, or 4 and answered:

      (1) "No" for Philip Ebel to Question 1, or

      (2) 50 percent or less for Philip Ebel to Question 6.

Otherwise, do not answer Question No. 8.[71]

## QUESTION NO. 8 - ALLEGED SURVIVAL DAMAGES

What sum of money would have fairly and reasonably compensated Philip Ebel for—[72]

      a.      Pain and mental anguish.

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Philip Ebel before his death as a result of the occurrence in question.[73]

Answer in dollars and cents, for damages, if any.

Answer: _____

      b.      Funeral and burial expenses.

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Philip Ebel reasonably suitable to his station in life.[74]

Answer in dollars and cents, for damages, if any.

Answer: _____

Do not reduce the amount, if any, in your answers because of the negligence, if any, of Philip Ebel.[75]

---

[71] PJC 82.1.

[72] PJC 82.3.

[73] PJC 82.3.

[74] PJC 82.3.

[75] PJC 82.3.

Answer the following question regarding Lilly only if you unanimously answered "Yes" to Questions 1, 2, 3, or 4 regarding Lilly.  Otherwise, do not answer the following question regarding Lilly.

To answer "Yes" to the following question, your answer must be unanimous, just as it must be to answer any other question.[76]

## QUESTION NO. 9 - PREDICATE

Do you find by clear and convincing evidence that the harm to Philip Ebel resulted from gross negligence?[77]

"Clear and convincing evidence" means that measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.[78]

"Gross negligence" means an act or omission by Lilly,

(a) which when viewed objectively from the standpoint of Lilly at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(b) of which Lilly has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[79]

Answer "Yes" or "No"

Answer:_____

---

[76]   PJC 85.1C (modified to account for the unanimity requirement in Rule 48 of the Federal Rules of Civil Procedure).

[77]   PJC 85.1C.

[78]   PJC 85.1C.

[79]   PJC 85.1C.

260712v2

Answer the following question only if you unanimously answered "Yes" to Question 9. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous, just as it must be to answer any other question.[80]

## QUESTION NO. 10 - LIMITATION

Did Lilly knowingly or intentionally cause bodily injury to a disabled individual?[81]

"Disabled individual" means a person older than 14 years of age who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect himself from harm or to provide food, shelter, or medical care for himself.[82]

A person acts intentionally, or with intent, with respect to the nature of its conduct or to a result of its conduct when it is its conscious objective or desire to engage in the conduct or cause the result.[83]

---

[80]    PJC 85.5-.10 (modified to account for the unanimity requirement in Rule 48 of the Federal Rules of Civil Procedure).

[81]    Drafted on the basis of TEX. CIV. PRAC. & REM. CODE § 41.008(c) (limiting this exception to only conduct that is committed knowingly or intentionally); TEX. PEN. CODE ANN. § 22.04 (Vernon 2003 & Supp. 2007); PJC 85.11. Lilly strenuously objects to the submission of this question. There is no evidence that Lilly knowingly or intentionally set out to harm Philip Ebel. Indeed, the accusation is remarkable because there is no evidence (1) that Lilly even knew Ebel or Ebel's condition or (2) that Lilly knew that Ebel's doctor would prescribe Zyprexa to treat Ebel for an off-label use. This result is especially obvious because Lilly warned about akathisia. *See Gravis v. Parke-Davis & Co.*, 502 S.W.2d 863, 870 (Tex. App.—Corpus Christi 1973, writ ref'd n.r.e.) ("Once the physician has been warned, the choice of which drugs to use, and the duty to explain the risks involved, is his."); *Brumley v. Pfizer, Inc.*, 149 F. Supp. 2d 305, 310 (S.D. Tex. 2001) ("if a warning specifically mentions the circumstances complained of, the warning is adequate as a matter of law.") (citations omitted) (applying Texas law). Dr. Nett knew about the purported link between akathisia and suicide at the relevant time. *See* Deposition of Dr. Nett at 129:3-130:6 & 130:24-131:16.

Lilly also requests that the Court submit this question with a heightened evidentiary standard (either "beyond a reasonable doubt" or "clear and convincing evidence"). *See Mission Resources, Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 315 (Tex. App.—Corpus Christi 2005, pet. granted) (holding that a jury must find criminal responsibility "beyond a reasonable doubt" in order for punitive damages judgment to exceed the statutory caps under TEX. CIV. PRAC. & REM. CODE § 41.008).

[82]    TEX. PEN. CODE ANN. § 22.04(c)(3) (Vernon 2003 & Supp. 2007). This Court should also refuse to submit this question to the jury because Philip Ebel is not disabled under this definition. First, Ebel was able "to protect himself" in that he was good about reporting back to his doctor. *See* Deposition of Dr. Nett at 80:20-81:2 & 118:6-15 & 130:3-6. He was also able to stop medications himself. *Id.* at 115:6-116:17. In fact, plaintiff argued that Ebel "was an 'enthusiastic' patient who was focused on getting better and being a functional provider for his family, to include investigating new business opportunities." Plaintiff's Response and Memorandum in Opposition to Lilly's Motion for Summary Judgment at 3 ¶6. Similarly, plaintiff herself proves that Ebel was able to "provide … for himself." Specifically, she asserts a lost profits claim based on Ebel's death. *See* Complaint at 6 ¶16 ("However, Mr. Ebel was an exceedingly smart and highly motivated man. Therefore, he and his family moved to the Valley and, in the months preceding his death, he was pursuing a significant new business opportunity."); *see also* June 28, 2007 Expert Report of James P. Mandel, Ph.D. (calculating $437,050 in lost household services, in addition to lost profits).

[83]    TEX. PEN. CODE ANN. § 6.03(a) (Vernon 2003); PJC 85.11.

A person acts knowingly, or with knowledge, with respect to the nature of its conduct or to circumstances surrounding its conduct when it is aware of the nature of its conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of its conduct when it is aware that its conduct is reasonably certain to cause the result.[84]

Lilly can only be found to have acted knowingly or intentionally if its action was authorized, requested, commanded, performed, or recklessly tolerated by (1) a majority of the governing board acting in behalf of Lilly or (2) a high managerial agent acting in behalf of Lilly and within the scope of his office or employment.[85]

A person does not act knowingly or intentionally if that person does not know that the alleged victim is disabled.[86]

Answer "Yes" or "No"

Answer:_____

---

[84]   TEX. PEN. CODE ANN. § 6.03(b) (Vernon 2003); PJC 85.11.

[85]   TEX. PEN. CODE ANN. § 7.22(b) (Vernon 2003); *see also Healthcare Centers of Texas, Inc. v. Rigby*, 97 S.W.3d 610, 620 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (criticizing jury question under Section 22.04 for lack of "correct definitions and instructions for corporate criminal responsibility").

[86]   *Plants v. State*, 124 S.W.3d 414, 416 (Tex. App.—Fort Worth 2003, no pet.).  As far as Lilly has been able to determine, only the *Plants* case has directly addressed whether the accused must have knowledge of the disability in order to be liable under Section 22.04.  *But cf. Zubia v. State*, 998 S.W.2d 226, 227 (Tex. Crim. App. 1999) (per curiam) (finding liability where the accused did not have knowledge of the victim's age).  There is no evidence that Lilly was aware that Philip Ebel was allegedly disabled—in fact, Ebel was not disabled.

260712v2

Answer the following question regarding Lilly only if you unanimously answered "Yes" to Question 9 regarding Lilly.  Otherwise, do not answer the following question regarding Lilly.[87]

## QUESTION NO. 11 - ALLEGED EXEMPLARY DAMAGES

You are instructed that, in order for you to find exemplary damages, your answer to the question regarding the amount of such damages must be unanimous, just as it must be to answer any other question.[88]

What sum of money, if any, should be assessed against Lilly and awarded to Beatriz E. Ebel as exemplary damages for the death of Philip Ebel?[89]

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes.  Exemplary damages includes punitive damages.[90]

Factors to consider in awarding exemplary damages, if any, are—

a.   The nature of the wrong.

b.   The character of the conduct involved.

c.   The degree of culpability of the wrongdoer.

d.   The situation and sensibilities of the parties concerned.

e.   The extent to which such conduct offends a public sense of justice and propriety.

f.   The net worth of Lilly.[91]

Answer in dollars and cents, if any.

Answer:_____

---

[87]   PJC 85.3C.

[88]   TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(e) (modified to account for the unanimity requirement in Rule 48 of the Federal Rules of Civil Procedure).

[89]   PJC 85.3C.

[90]   PJC 85.3C.

[91]   PJC 85.3C.

260712v2

## CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

I certify that the jury was unanimous in answering all questions.

_____
FOREPERSON OF THE JURY


_____
Printed Name of Foreperson of the Jury[92]

---

[92]     PJC 40.3 (modified to account for the unanimity requirement in Rule 48 of the Federal Rules of Civil Procedure and the use of the term "foreperson of the jury" in the Fifth Circuit Pattern Jury Instructions).

260712v2